IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br>　　　　Plaintiff,<br>　　v.<br><br>ALLEGHENY GULF INVESTMENTS, INC., and RICHARD A. HALE,<br>　　　　Defendants. | Civil Action No. H-03-3526<br><br>**(Proposed) ORDER OF PERMANENT INJUNCTION AND OTHER ANCILLARY RELIEF AGAINST DEFENDANTS RICHARD A. HALE AND ALLEGEHENY GULF INVESTMENTS, INC.** |

　　　　This matter comes before the Court on the motion of Plaintiff Commodity Futures Trading Commission ("Commission") for summary judgment against Defendants Richard A. Hale ("Hale") and Allegheny Gulf Investments, Inc. ("Allegheny") (collectively "the Defendants").

　　　　On or about October 8, 2003, Charles A. Steen ("Steen"), the registered agent for Allegheny, acknowledged receipt of the complaint and waived service of the summons. On November 8, 2003, Defendant Hale was duly served with a copy of the summons and Complaint. On or about November 26, 2003, Defendants filed a joint answer to the complaint.

　　　　On February 27, 2003 the Court entered a Docket Control Order. On or about October 29, 2004, the Commission submitted a Motion for Summary Judgment, Memorandum in Support of Motion for Summary Judgment, and Exhibits in compliance with the Court's Docket Control Order and the requirements of the Local Rules. A copy of the Motion, Memorandum, and Exhibits were mailed via First Class Mail to Defendant Hale on October 29, 2004 at a P.O. Box address that Hale provided to the Commission. The Court has carefully considered the Complaint, the aforementioned Motion and other written submissions of the Commission filed with the Court, and all oppositions thereto, and being fully advised in the premises, hereby

　　　　**GRANTS** the Commission's Motion for Summary Judgment against Defendants Hale and Allegheny and enters findings of fact and conclusions of law. Accordingly, the Court now

issues the following Order of Permanent Injunction and Other Ancillary Relief against Defendants Hale and Allegheny on the issues of liability and orders further submissions as to the issue of an appropriate civil monetary penalty.

## I.
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

**THE COURT FINDS THAT:**

1. This Court has jurisdiction over the subject matter of this action and Defendants pursuant to Section 6c of the Commodity Exchange Act ("Act"), 7 U.S.C. § 13a-1 (2001), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

2. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1, in that Defendants are found in, inhabit and transacted business in the Southern District of Texas, and the acts and practices in violation of the Act occurred within this district, among other places.

### Background

3. Hale and Steen formed Allegheny in 1996 for the purpose of trading physical natural gas.

4. Hale and Steen each owned 50% of the shares of Allegheny.

5. From at least April 1998 through May 2000 ("relevant period"), Hale managed and controlled the trading for Allegheny on a Commission-regulated exchange.

6. During the relevant period, Steen was primarily responsible for the bookkeeping of Allegheny.

2

7. During the relevant period, Allegheny maintained four commodity futures and options on futures trading accounts at Refco, Inc. ("Refco").

**Refco Accounts**

8. On or about April 29, 1998, Allegheny opened a trading account ("Master Account") at Refco for the purpose of hedging and speculating in natural gas futures and options on futures contracts.

9. Between November 1998 and January 1999, Allegheny entered into three joint venture agreements ("JV Agreements") with three individuals, Arthur Pasmas ("Pasmas"), Wayne Laufer ("Laufer"), and Rick Avare ("Avare"), (collectively, "JV participants"), for the purpose of trading natural gas futures and options on futures contracts in three sub-accounts ("Sub-Account(s)") established at Refco.

10. Between approximately December 1998 and January 1999, Allegheny opened the three Sub-Accounts at Refco in the name of Allegheny.

11. Pasmas and Allegheny each invested $1,000,000 into one of the Sub-Accounts established at Refco.

12. Hale began trading the Sub-Account established for Pasmas and Allegheny ("Pasmas/Allegheny Account") in or about December 1998.

13. Avare and Allegheny each invested $200,000 into another Sub-Account established at Refco.

14. Hale began trading the Sub-Account established for Avare and Allegheny ("Avare/Allegheny Account) on or about January 15, 1999.

15. Laufer and Allegheny each invested $600,000 into the third Sub-Account established at Refco.

16. Hale began trading the Sub-Account established for Laufer and Allegheny ("Laufer/Allegheny Account") on or about January 11, 1999.

17. Hale made all of the trading decisions for the Master Account and Sub-Accounts at Refco.

18. Hale traded natural gas futures contracts and options contracts in each of the Sub-Accounts established at Refco.

**Joint Venture Agreements**

19. Each of the JV Agreements contained similar standard provisions, which provided in part that:

(a) By operation of the Joint Venture Agreement, Allegheny would create a sub-account at Refco to trade the client's funds;

(b) Allegheny and each joint venturer would deposit an equal amount into the joint account. Each party would receive one half of all profits or losses and neither party would be required to make further deposits;

(c) Allegheny would trade the funds using natural gas options and/or futures. Allegheny would routinely provide the joint venturer with information reflecting the sub-account's position;

(d) Each quarter, Allegheny would be entitled to 15% of all profits (but not losses) of the joint venturer's gains, if any, marked to market for the quarter;

(e) After twelve months, either party could cancel the agreement or request partial or total liquidation at the end of any quarter with 15 days written notice to the other party; and

(f) If the agreement extended beyond the first twelve months, the fees payable to Allegheny would increase from 15% to 20%.

20. None of the JV Agreements mentioned that the Sub-Accounts established for the JV participants would be cross-margined with Allegheny's Master Account.

### Cross-Margining

21.     During this period, Allegheny accepted approximately $1.8 million from the JV participants to trade futures and options on futures in the Sub-Accounts. In or about January 1999, Refco issued a memo concerning the Master Account and the three Sub-Accounts.

22.     The memo stated that the "client" requested that each of the sub-accounts be co-margined with the Master Account.

23.     The JV participants were not aware that their accounts were cross-margined with the Master Account.

24.     Prior to and during the trading of the Sub-Accounts, the Defendants failed to disclose to the JV participants that their accounts would be cross-margined with the Master Account.

25.     In or about July 1999, the Master Account had a negative balance of $1,667,809.57.

26.     Hale continued to trade the Master Account until at least October 1999, when the account reached a negative balance of $1,899,804.97.

27.     On November 5, 1999 $100,000 was withdrawn from the Allegheny Master Account.

28.     At the end of November 1999, the Allegheny Master Account had a negative balance of $1,999,449.40.

29.     On May 17, 2000, a total of $1,999,403.37 was transferred from two of the Sub-Accounts to the Allegheny Master Account to cover this deficit. In particular, $1,727,258.89 was transferred from the Pasmas/Allegheny Sub-Account and $272,144.48 was transferred from the Avarc/Allegheny Sub-Account.

30. As a result of the cross-margining, Pasmas and Avare lost a total of approximately $1,000,000.

31. Laufer withdrew his share of the investment with Allegheny, $533,564.25, prior to the cross-margining of the Master account and Sub-Accounts.

32. Pasmas lost a total of $863,629.45.

33. Hale has repaid substantially all of the funds owed to Pasmas.

34. On or about January 28, 2000, Hale issued a check to Pasmas in the amount of $25,000. On or about March 4, 2002 Hale paid Pasmas $350,000.

35. On or about March 19, 2002 Hale paid Pasmas $400,000.

36. Avare lost a total of $136, 072.24.

37. Avare has not been repaid any of the losses he sustained as a result of the cross-margining.

### Allegheny Accepted Investment Funds In Its Own Name

38. To fund their portions of the Sub-Accounts, each of the JV participants was instructed to wire their investment funds directly to a bank account held in the name of Allegheny.

39. Each of the JV participants wired their initial deposits to an account held at Frost National Bank in the name of Allegheny.

## CONCLUSIONS OF LAW

### VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS THEREUNDER

#### VIOLATIONS OF SECTION 4b(a)(2)(i) and (iii) OF THE ACT: FUTURES FRAUD

40. During the relevant time, Hale violated Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), in that he: (i) cheated or defrauded or attempted to cheat or defraud other persons; and (iii) willfully deceived or attempted to deceive other persons by making misrepresentations and omissions of material facts, including, but not limited to, his failure to disclose the cross-margining of the Master and Sub-Accounts to the JV participants as set forth in paragraphs 19 thru 37.

41. Hale engaged in this conduct in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof.

42. The misrepresentations and omissions of Hale described in this count were while Hale was an officer and an agent of Allegheny and, therefore, Allegheny is also liable for his violations of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i) and (iii), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

43. Each material misrepresentation and omission, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(i) and (iii).

### VIOLATIONS OF SECTION 4c(b) OF THE ACT AND REGULATION 33.10: OPTIONS FRAUD

44. During the relevant time, Hale violated Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Regulation 33.10, 17 C.F.R. §33.10 in that he: (i) cheated or defrauded or attempted to cheat or defraud other persons; and (iii) deceived or attempted to deceive other persons by: misappropriating client funds, making material misrepresentations and omissions of material facts to clients and prospective clients including, but not limited to, the misrepresentations or omissions set forth in paragraphs 19 thru 37. Hale's misrepresentations and omissions described in this count were made in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, commodity options transactions.

45. The misrepresentations and omissions of Hale described in this Count were done while Hale was an officer and an agent of Allegheny and, therefore, Allegheny is also liable for his violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Regulation 33.10, 17 C.F.R. § 33.10, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

46. Each material misrepresentation and omission, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) and Regulation 33.10, 17 C.F.R. §33.10.

### VIOLATIONS OF SECTION 4o(1) OF THE ACT: FRAUD BY A CTA

47. During the relevant time, Allegheny, acted as a CTA pursuant to Section 1a(6) of the Act as set forth in paragraphs 8 thru 19 above. Hale, acting as an AP of Allegheny, violated

8

Section 4o(1), 7 U.S.C. § 6o(1) by directly or indirectly employing one or more devices, schemes, or artifices to defraud clients or prospective clients and by engaging in transactions, practices or courses of business which operated as a fraud or deceit upon clients or prospective clients in that they made misrepresentations and omissions of material facts including, but not limited to, the misrepresentations or omissions set forth in paragraphs 8 thru 37. These acts were effected by use of the mails or other means or instrumentalities of interstate commerce.

48. The misrepresentations and omissions of Hale described in this Count were done while Hale was an officer and an agent of Allegheny and, therefore, Allegheny is also liable for his violations of Section 4o(1), 7 U.S.C. § 6o(1), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B).

49. Hale, directly or indirectly, controlled Allegheny and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Allegheny's violations alleged in this count, and thereby Hale is also liable for Allegheny's' violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1), pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

50. Each material misrepresentation and omission, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4o(1) and of the Act, 7 U.S.C. § 6o(1).

## VIOLATIONS OF COMMISSION REGULATION 4.30, 17 C.F.R. § 4.30: PROHIBITED ACTIVITIES BY CTAs

51. During the relevant time, Allegheny, while acting as a CTA, solicited, accepted or received from existing or prospective clients funds, securities or other property in its own name to purchase, margin, guarantee or secure commodity interests of clients by causing the funds of

three clients to be deposited into a bank account controlled by, and in the name of, Allegheny as set forth in paragraphs 38 and 39. Therefore, Allegheny violated Commission Regulation 4.30.

52. Hale, directly or indirectly, controlled Allegheny and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the Allegheny's violations alleged in this count, and thereby Hale is also liable for Allegheny's violations of Regulation 4.30 pursuant to Section 13(b) of the Act.

53. Each act of solicitation, acceptance or receipt of funds, securities or other property in Allegheny's name to purchase, margin, guarantee or secure any commodity interest of a Client is alleged as a separate and distinct violation of Regulation 4.30.

## II.

## ORDER FOR PERMANENT INJUNCTION

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

1. Defendants, and all persons insofar as they are acting in the capacity of agents, servants, employees, successors, assigns, or attorneys of Defendants, and all persons insofar as they are acting in active concert or participation with Defendants, who receive actual notice of this Order by personal service or otherwise, shall be permanently restrained, enjoined and prohibited from directly or indirectly:

    A. in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other persons, where such contract for future delivery was or could be used for (a) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped, or

received in interstate commerce for the fulfillment thereof:

    i.    cheating or defrauding or attempting to cheat or defraud such other persons; and
    iii.    willfully deceiving or attempting to deceive such other persons;

all in violation of Section 4b(a)(i) and (iii) of the Act, 7 U.S.C. §§ 6b(a)(i) and (iii).

B.    in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction:

    i.    cheating or defrauding or attempting to cheat or defraud such other persons; and
    iii.    deceiving or attempting to deceive such other persons;

all in violation of Section 4c(b) of the Act, 7 U.S.C. §§ 6c(b) and Regulation 33.10, 17 C.F.R. §33.10;

C.    while acting as a Commodity Trading Advisor ("CTA") as defined by Section 1a(6), employing a device, scheme or artifice to defraud clients or prospective clients by use of the mails or any means or instrumentality of interstate commerce directly or indirectly, all in violation of Section 4o(1)(A) of the Act;

D.    while acting as a CTA, soliciting, accepting, or receiving from existing or prospective clients funds, securities or other property in the trading advisor's name, all in violation of Regulation 4.30, 17 C.F.R. § 4.30.

2.    Defendants and all persons insofar as they are acting in the capacity of agents, servants, employees, successors, assigns, or attorneys of Defendants, and all persons insofar as they are acting in active concert or participation with Defendants, who receive actual notice of this Order

11

by personal service or otherwise, are further permanently restrained, enjoined and prohibited from directly or indirectly:

    A.    trading on or subject to the rules of any registered entity;

    B.    engaging in, controlling or directing the trading of any futures or options accounts for or on behalf of any other person or entity, whether by power of attorney or otherwise; and

    C.    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R.§ 4.14(a)(9), or acting as a principal, agent, officer or employee of any person registered, required to be registered, or exempted from registration, except as provided for in Regulation 4.14(a)(9).

*Monetary Judgment*

**III.**

**IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:**

Plaintiff Commission is awarded judgment against Defendants for a civil monetary penalty in the amount of $440,000. Further, Defendants shall pay post-judgment interest on the civil monetary penalty amount thereon from the date of this Order until the civil monetary penalty amount is paid in full at the rate established pursuant to 28 U.S.C. § 1961.


## IV.

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this action, and of any ancillary or supplemental actions hereto, in order to, among other things, implement and carry out the terms of all orders, judgments, and decrees that may be entered herein, including those that may be necessary to assure compliance with this Order of Permanent Injunction and Entry of Final Judgment Against Defendants.

*THIS IS A FINAL JUDGMENT*

**SO ORDERED**, at Houston, Texas on this _17th_ day of _December_, _2004_.

Hon. Judge Sim Lake
United States District Judge

Copies furnished to:
**Eugene Smith, Esq.**
1155 21st St., NW
Washington, DC 20581

**Richard A. Hale,** *pro se*
P.O. Box 771071
Houston, Texas 77215

## CERTIFICATE OF SERVICE

I, Eugene Smith, hereby certify that a true and correct copy of Plaintiff's *(Proposed) Order of Permanent Injunction and Other Ancillary Relief Against Defendants Richard Hale and Allegheny Gulf Investments, Inc.* was sent via First Class Mail and addressed to the following persons on December 15, 2004:

Richard A. Hale
P.O. Box 771071
Houston, Texas 77215
*(pro se)*

By: /s/ Eugene Smith

Eugene Smith, Trial Attorney
Attorney for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
Division of Enforcement
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5371
(202) 418-5523 facsimile